AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| Subject Premises located at: | ) |
| 15219 NE 90th Street, Redmond, WA 98052, | ) |
| as further described in Attachment A | ) |

Case No.  MJ20-532

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 331 | Introduction of Misbranded Drugs Into Interstate Commerce |

The application is based on these facts:

✓ See Affidavit of Special Agent Angela Zigler continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days): _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or; ☐ telephonically recorded.

*Applicant's signature*

Angela Zigler, Special Agent, FDA-OCI
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____08/19/2020_____

*Judge's signature*

City and state: _____Seattle, Washington_____

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

**A F F I D A V I T**

STATE OF WASHINGTON          )          ss

COUNTY OF KING                    )

## INTRODUCTION AND AGENT BACKGROUND

I, ANGELA ZIGLER, being first duly sworn on oath, depose and say:

## INTRODUCTION AND AGENT BACKGROUND

1.       I am a Special Agent with the Food and Drug Administration (FDA), Office of Criminal Investigations (OCI) and have been so employed since November 2012.   As such, I am responsible for investigating criminal violations of the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301 et seq.; the Controlled Substances Act, 21 U.S.C. §§ 801 et seq.; the Public Health Service Act, 42 U.S.C. §§ 201 et seq.; and related violations within Title 18 of the United States Code.  Prior to my employment with FDA-OCI, I was a Special Agent with the U.S. Department of Treasury, Treasury Inspector General for Tax Administration.  My professional and academic training includes intensive training at the Federal Law Enforcement Training Centers in Glynco, GA and Charleston, SC.  Additionally, I have completed the Basic Investigative Electronics Training Program and the Pharmaceutical Fraud Training Program.  During my law enforcement career, I have conducted and participated in federal criminal investigations involving but not limited to pharmaceutical fraud, financial fraud, extortion, conflict of interest violations, obstruction of tax administration, and unauthorized access to government computers.  I have participated in the execution of search warrants on businesses and residences in connection with suspected mail fraud, wire fraud, and the introduction of misbranded and/or adulterated drugs, devices, and/or food.  I have also participated in executing arrest warrants in pharmaceutical fraud investigations.

## PURPOSE OF AFFIDAVIT

2.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at

Affidavit of Angela Zigler/ - 1

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    15219 NE 90th Street, Redmond, WA 98052 (hereinafter "SUBJECT PREMISES"), as

2    more fully described in Attachment A to this Affidavit, for the property and items

3    described in Attachment B to this Affidavit, as well as any digital devices or other

4    electronic storage media located therein.

5        3.    Based on my training and experience and the facts as set forth in this

6    Affidavit, there is probable cause to believe that the SUBJECT PREMISES contains

7    evidence, fruits and instrumentalities of violations of Title 21, United States Code,

8    Section 331(a) (Introduction of a Misbranded Drug into Interstate Commerce).

9        4.    The facts set forth in this Affidavit are based on my own personal

10   knowledge, knowledge obtained from other individuals during my participation in this

11   investigation, including other law enforcement officers, review of documents and records

12   related to this investigation, communications with others who have personal knowledge

13   of the events and circumstances described herein, and information gained through my

14   training and experience.  Because this Affidavit is submitted for the limited purpose of

15   establishing probable cause in support of the application for a search warrant, it does not

16   set forth each and every fact that I or others have learned during the course of this

17   investigation.

18       **<u>BACKGROUND</u>**

19       5.    The FDA is charged with protecting the health and safety of the American

20   public by enforcing the FDCA, including 21 U.S.C. § 331.  One purpose of the FDCA is

21   to ensure that drugs sold for use by humans were safe, effective, and bore labeling

22   containing only true and accurate information.

23       6.    Under the FDCA, the "intended use" of an article means the objective

24   intent of the persons legally responsible for the labeling of that article.  The intent is

25   determined by such persons' expressions or can be shown by the circumstances

26   surrounding the distribution of the article.  This objective intent might, for example, be

27   shown by labeling claims, advertising matter, or oral or written statements by such

28   persons or their representatives.  It might be shown by the circumstances that the article

Affidavit of Angela Zigler/ - 2

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it was neither labeled nor advertised.  21 C.F.R § 201.128.

7. Under the FDCA, "label" means "a display of written, printed, or graphic matter upon the immediate container of any article." 21 U.S.C. § 321(k).  The FDCA's requirement that any word, statement, or other information appear on the label is satisfied only if the word, statement, or other information also appears on the outside container or wrapper, if such exists, of the retail package of such article, or is easily legible through the outside container or wrapper.  Id.  "Labeling" is more broadly defined as all labels and other printed or graphic matter upon any article or any of its containers or wrappers, or accompanying such article.  21 U.S.C. § 321(m).

8. Under the FDCA, "drugs" are defined as, among other things, articles intended for use in the cure, mitigation, treatment or prevention of disease in man (21 U.S.C. § 321(g)(a)(B)); articles (other than food) intended to affect the structure or function of the body of man (21 U.S.C. § 321(g)(1)(C)); or articles intended for use as components of other drugs (21 U.S.C. § 321(g)(1)(D)).

9. A "new drug" is any drug which is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof.  21 U.S.C. § 321(p)(1).  In order to be lawfully introduced or delivered into interstate commerce, a new drug had to be the subject of a New Drug Application which has been approved by the FDA. 21 U.S.C § 355.

10. Pursuant to 21 U.S.C. §353(b)(1), a "prescription drug" is any drug intended for use by man which:

a. because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or

Affidavit of Angela Zigler/ - 3

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.  is limited by an approved new drug application to use under the professional supervision of a practitioner licensed by law to administer such drug.

11.     Owners and operators of any establishment in any State where drugs are manufactured must register each such establishment with FDA.  21 U.S.C. § 360(b) & (c).  Likewise, foreign establishments must be similarly registered with FDA before they import drugs from such establishments into the United States.  21 U.S.C. § 360(i).  "Manufacturing" includes, among other things, not just processing of raw materials into finished drug products, but also repackaging or otherwise changing the container, wrapping or labeling of any drug package to further the distribution of the drug from the original manufacturer to the ultimate consumer.  21 U.S.C. §360(a)(1); 21 C.F.R. § 207.3(a)(8).

12.     A drug can be misbranded in several ways.  For example, a drug is misbranded if:

a.  its labeling is false or misleading in any particular (21 U.S.C. § 352(a));

b.  it is in package form, unless it bears a label containing the name and place of business of the manufacturer, packer, or distributor (21 U.S.C. § 352(b)); or

c.  its manufactured, prepared, propagated, compounded, or processed in an establishment not registered with the FDA under 21 U.S.C. § 360, or it was not included in a list required by 21 U.S.C. §360(j) (21 U.S.C. § 352(o)).

13.     A drug is also misbranded if the labeling of the drug does not bear adequate directions for use (21 U.S.C. § 352(f)(1)).  "Adequate directions for use" means directions under which the layman can use a drug safely and for the purposes for which it is intended (21 C.F.R. § 201.5).  Directions under which the layperson can use a prescription drug safely cannot be written because such drugs can only be used safely, if at all, at the direction, and under the supervision, of a licensed medical practitioner.  There are some exemptions from this general requirement for approved prescription

Affidavit of Angela Zigler/ - 4

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  drugs with their approved labeling, but no such exemptions exist for a drug lacking an

2  FDA approval.

3       14.     In addition, the dispensing of any prescription drug without a valid

4  prescription written by a licensed medical practitioner is an act which results in the drug

5  being misbranded while held for sale.  21 U.S.C. § 353(b)(1).

6                  **FACTS SUPPORTING PROBABLE CAUSE**

7       15.     According to the Center for Disease Control and Prevention the severe

8  acute respiratory syndrome coronavirus 2 (SARS-CoV-2) produces a respiratory disease,

9  COVID-19.  COVID-19 is capable of being spread from person to person. COVID-19

10  can cause mild symptoms (even no symptoms) to severe illness and it has a wide range of

11  associated symptoms such as fever, cough, shortness of breath or difficulty breathing,

12  chills, muscle pain, headache, sore throat and new loss of taste or smell.  These

13  symptoms may appear two to fourteen days after exposure to the virus.  There is currently

14  no vaccine to prevent COVID-19.

15      **A. Background of John T. Stine and North Coast Biologics**

16       16.     On March 12, 2020, the FDA-OCI initiated an investigation into John T.

17  Stine (also known as Johnny Stine), of Redmond, Washington, after receiving a

18  complaint that Stine posted to LinkedIn that he had manufactured a Coronavirus Disease

19  2019 (COVID-19) vaccine, and was offering to supply and administer the vaccine to

20  those who contacted him in Washington state and in other states.

21       17.     A review of Johnny Stine's LinkedIn page stated that he was the Founder

22  & President of North Coast Biologics, Seattle, WA from September 2008 to present.  The

23  "About" section listed "NCB:-Personalized biotech/biotech without borders: Creating and

24  administering personalized autologous tumor vaccines for cancer patients who request

25  this service. No patient is turned away regardless of tumor's frequency or market size."

26       18.     During the investigation, I searched the Washington State Department of

27  Health Provider Credential database at

28  https://fortress.wa.gov/doh/providercredentialsearch/Search for the name John Stine.  A

Affidavit of Angela Zigler/- 5

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  search of the name provided the result "John Patrick Stine" as a "Counselor Agency

2  Affiliated Registration."  This license was deemed "surrendered" and expired as of

3  August 22, 2016.  John Patrick Stine is not believed to be Johnny T. Stine.

4        19.      I searched the Washington Corporations and Charities Filling System

5  database at https://ccfs.sos.wa.gov/#/ for the business name North Coast Biologics. A

6  search of the business name provided the result "North Coast Biologics, LLC" in Seattle,

7  WA.  This business was registered to Johnny Stine on September 30, 2011.  This business

8  was administratively dissolved on January 3, 2012.

9        20.      I searched the Washington State Department of Revenue business records

10  database at https://secure.dor.wa.gov/gteunauth/_/#1 for the business name North Coast

11  Biologics.  A search of the business name provided the result "North Coast Biologics,

12  LLC" located in Seattle, WA and governed by Johnny Stine.  As of April 30, 2020, this

13  business was listed as "Active."

14        21.      A search of FDA Center for Biologics Evaluation and Research (CBER),

15  Electronic Document Room database and the FDA Center for Drug Evaluation and

16  Research's (CDER) Document Archiving, Reporting, and Regulatory Tracking System

17  did not return any submissions and/or applications from Stine and/or North Coast

18  Biologics.

19      **B.  Relevant Facebook Pages**

20        22.      I reviewed "Johnny T Stine" Facebook Page, which included the

21  following four-paragraph Facebook post, dated March 2, 2020**:**

22              a.  I can no longer stay silent.  No government or corporation is ever going to

23                  protect us.  We are the one's who have to look out for each other.  I have

24                  already crossed some major lines creating personalized tumor vaccines for

25                  people who wish to actually fight for their life with legitimate tools,

26                  knowledge, and skills that I've acquired over the years.  I did this with a

27                  GREAT deal of apprehension because I was afraid to do this.  Because it

28                  took me longer than it should have to break through the conventional

Affidavit of Angela Zigler/- 6

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"wisdom" forced on me by my industry, I personally feel that some of the earliest people who asked for my help died because I failed to garner enough courage to make this leap.  After ˜127 cancer patients and more waiting, I'm obviously no longer afraid.

b.  I've been making immunogens to raise immune response since 1987 and I've pursued anti-viral antibodies at various points in my career (CMV, Flu, KSHV, RSV, HIV).  So to make this post short and sweet….. I've mentioned that I made a vaccine to nCoV-'19 to the Spike protein and the receptor binding domain of this protein.  I made a small amount for testing.  After one shot (˜25 ugs) and two weeks I was titer-positive to the vaccine.  I contain blocking antibodies to the Spike protein RBD (receptor binding domain) which indicates these would be neutralizing in vitro.  After the primary immunization (without boosts), I sent my sera to a friend who is partnered with a group in China that can do functional assays-and guess what-my sera contains antibodies that are functionally inhibitory.  No big surprise there but the groovy thing is that I sent my sera over there without even a boost. I have boosted myself to see how that raises the titer (I'll check it in a couple of weeks).  So I'm immune to nCoV-2019.

c.  I'm offering my vaccine to people who simply feel that they need it because of increased risk or simply because it would make them comfortable.  I'm not sure how much of the reports are hype or not, but the deaths are real and thus I can no longer sit on the sidelines.  I'm not able to save the world much less a small town, but I can begin by taking orders for vaccinations.  I can begin with 100 people because I'm limited on how much protein I can generate (the costly part).  If interested parties pay $400/person, I can order up enough protein to be made to give each person a primary vaccination with two boosts (this is like the HepB vaccination protocol).  The first 100 will be determined by the time stamp on payment (message me here or by

Affidavit of Angela Zigler/ - 7

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

text 206-605-0100).  If there is greater interest, I will need to outsource the protein expression.  I will administer the vaccine here in the Seattle area or I'll come to you.

d. If I make money from this, it will go toward funding the tumor vaccine protocols of the 85% of the cancer patients that I see who are already $500K-$750K in debt and homeless after standard of care by the time they find me (I've been treating them for free).  I turn no one away regardless of stage/progression-why would I deny anyone a right to fight for their life with tools that can legitimately make a difference?

23.    I reviewed the North Coast Biologics (NCB) Facebook Page (http://www.facebook.com/NCBio/), which listed "Founder & President Johnny Stine" and included the following Facebook post, dated March 11, 2020: "NCB's COVID19 spike protein vaccine is being made available to those who are either at risk or for anyone who simply needs some reassurance.  Two shots get you a titer that binds the spike protein and the receptor binding domain.  Message us here to create a spot in the queue. This isn't large scale industrial by any means….but locally, very effective."

### C. Initial Undercover Contact with Stine

24.    On March 12, 2020, I (acting in an undercover capacity as Angela) texted telephone number 206-605-0100 (SUBJECT PHONE NUMBER). This is the same telephone number listed on the Facebook post dated March 2, 2020.  I sent the following text message to the SUBJECT PHONE NUMBER: "Hi I saw your post about the coronavirus vaccine.  I am SO glad someone is doing something about this!  I'm really interested in getting this for myself and for my mom who is in California.  I'm more worried about her cause she is older and has a compromised immune system.  Please let me know if you have any left. Thank you so much!  Angela."

25.    On March 12, 2020, I engaged in a text exchange regarding the coronavirus vaccine and received the following text messages from the SUBJECT PHONE NUMBER:  "It's easy.  I generally do the first one.  It's a two shot series and

1  we'll add something topically to assist in that immune response.  It's a very easy and
2  groovy approach."

3       **D. March 2020: discussions with Stine's associates**

4       26.     On March 27, 2020, I received a complaint that was filed with the FDA
5  by Individual-1, which stated that Individual-1's friend in Seattle, WA, was injected with
6  a vaccine for COVID-19 by Stine.

7       27.     On March 28, 2020, I spoke with Individual-1 who stated that his/her
8  friend, Individual-2, received an injection from "Johnny T. Stine" that was reported to be
9  a vaccine for COVID-19. Individual-1 emailed me text messages between Individual-1
10 and Individual-2, which included a photograph of Individual-2 being injected in the arm
11 by Stine dated March 18, 2020, and indicated that Individual-2 paid Stine for the vaccine
12 injection.  Additionally, Individual-1 emailed me correspondence between he/she and the
13 Subject Facebook Account via Facebook Messenger, in which the Subject Facebook
14 Account stated, "I was just in Tucson vaccinating a family there. I'll be back there for
15 their booster shots in four weeks."  Individual-1 also provided contact information for a
16 mutual friend, Individual-3, who spoke with Individual-2 about the reported vaccine.

17      28.     On March 30, 2020, I spoke with Individual-3 who emailed me
18 correspondence between Individual-3 and Individual-2 via Facebook Messenger. The
19 messages stated that Individual-2 was vaccinated for "Covid19" by his/her "mad scientist
20 friend," named "Johnny Stine." Individual-2 indicated that Stine "does personalized
21 medicine" and that "typically he takes your cancer tumor and figures out a way to kill it.
22 That's what he does for a living." Individual-3 asked Individual-2 if Stine was "licensed
23 with the State to be doing vaccinations" and Individual 2 replied, "No idea."

24      **E. Undercover Contact #2**

25      29.     On April 6, 2020, HSI SSA Dkane (in an undercover capacity acting as a
26 different individual than in previous contacts) contacted Stine via Facebook Messenger.
27 The undercover indicated that she saw Stine's posting on Facebook and that she wanted

28

Affidavit of Angela Zigler/ - 9

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  to purchase the Covid vaccine because she needed to go back to work. The following

2  statements were made during the text communication:

3        a.   Stine: "I can give you your primary shot today and boost you 2-3 weeks

4            later. Or I can give you a shot in both shoulders – very tiny needles."

5        b.   UC: "That's amazing." "My brother is on chemo and has a port. Could

6            you do it through there for him?"

7        c.   Stine: "It goes subcutaneously on the shoulder."

8        d.   UC: "He's in Idaho. You know anyone there that can help him? Or

9            could you show me how to do it for him when you do mine?"

10        e.   On April 7, 2020, Stine asked, "Where in Idaho?"

11        f.   UC: "Wallace."

12        g.   Stine: "…I can vaccinate him, but I need to know his chemo schedule

13            and also what his diagnosis is."

14  **F.  Additional undercover contact and April 9 meeting**

15      30.  On April 9, 2020, HSI SSA Dkane (acting in an UC capacity as Angela)

16  texted the SUBJECT PHONE NUMBER.  During the texted exchange a text from the

17  SUBJECT PHONE NUMBER stated: "Very quickly remind me again how you came

18  across my vaccine on FB.  Hopefully it wasn't because you are friends of one of the

19  Nazi's who back then was claiming everyone should wait 18 months for the FDA-

20  approved vaccine (which is exactly mine as far as target)."  At the end of the text

21  conversation, a text from the SUBJECT PHONE NUMBER included possible payment

22  options as Venmo, Bitcoin, Cash App and PayPal along with a text message, "These

23  digital options make it easy for some."

24      31.  On April 9, 2020, I (acting in an undercover capacity as Angela) and Seattle

25  Police Officer Sarah Velling (acting in an undercover capacity as Katie) conducted an

26  undercover meeting with Stine at the Dick's Burgers located at 111 NE 45th Street

27  Seattle, WA.  Prior to the meeting the undercover officers, received the following text

28  messages from the SUBJECT PHONE NUMBER: "I'm in line to get food" "White t-

Affidavit of Angela Zigler/ - 10

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  shirt that says Seattle" "Now I'm in my car on the opposite side you parked."  The

2  undercover officers located Stine based on the description he provided via text message.

3  I also recognized Stine from photographs posted on Facebook.

4       32.     During the undercover meeting, which was recorded, John T. Stine

5  provided the following statements regarding the COVID-19 vaccine:

a.  "So when I started doing this virus they said how did you get ahold of
Coronavirus to make your vaccine. I said I don't use the virus. I go to the
computer and I look for the little sequence, I download the sequence, send
it off to have the protein made, it comes back two days later. I vaccinate
myself. So on day twelve I was vaccinated."

b.  "I've already, I've already vaccinated breastfeeding moms."

c.  "I gotta get to Houston. Damn that's a long flight. But I gotta get to
Houston for a group there, I vaccinated seven M.D.'s down there."

14      33.     During the undercover meeting Stine made the following statements

15  regarding his personalized tumor vaccines:

a.  "My time my schedule is so fluid that I can't commit to anything because
things happen. Cancer patients always get top priority."

b.  "I just take the patients tumor, we do a few tricks to it to make sure it's safe
and groovy and then we put it subq. And then I activate with a cream a
topical a topical cream I activate the Langerhan cells and that's an approved
drug from the FDA. Um, and that thing works like magic.  It's awesome.
And so the Langerhan cells get pissed they eat what's next to them. They
go to the lymph node they and the Langerhan cell is the fast and the most
awesome prolific antigen presenter we have. They're the reason why we are
all here today."

c.  When asked, "how much is the down payment for her grandma?" Stine
replied, "Well ok so for the tumor vaccines it's a different story. But here's
the deal. Alright I basically I have 127 patients where it's like you look at

Affidavit of Angela Zigler/ - 11

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the scale it been zero zero zero zero zero zero the last eight so I have a

2  range of $200,000 to none to none. And it's a shit load on nones who can't

3  pay."

4  d.  "I got the Oklahoma the Oklahoma guy the Oklahoma guy says I'll pay you

5  $200,000 to keep my wife alive. She was given a three month sentence and

6  I and two years later she's still alive. Her metastatic tumors are gone."

7  34.  At the conclusion of the undercover meet, I paid Stine $800 in cash as a

8  down payment for future COVID-19 vaccinations for myself, mother and two additional

9  family/friends, in total a down payment of $200 per person.

10  35.  Following the undercover meet, agents conducted surveillance of Stine.

11  During the surveillance, at approximately 2:22 p.m., agents followed Stine in his vehicle

12  as he traveled to the parking lot of Zahntech located at 15215 NE 90th St, Redmond, WA.

13  (This address contains multiple units in a building which also includes the SUBJECT

14  PREMISES).   At approximately 2:53 p.m. agents observed Stine exiting the area.

15  **G. Further undercover contact with STINE**

16  36.  On April 23, 2020, Katie and the SUBJECT PHONE NUMBER

17  exchanged texts regarding the possibility of meeting in Portland to administer the vaccine

18  to Katie's grandma and friends.  Katie asked if she should see if Angela could get "her

19  people to come up?"  Katie received the reply from the SUBJECT PHONE NUMBER:

20  "Oh love, that would be fine-happy to go down there as well."

21  37.  On April 27, 2020, Katie received the following text message from the

22  SUBJECT PHONE NUMBER: "I'm in Tucson killing viruses." The texts continued,

23  "MT, ID, TX, NM, UT, AZ…..trying to get home and hit LA, SF, and NV on the way

24  back. Just got news that my lovely ovarian cancer patient with stage 4 tumors that her

25  tumors are shrinking!!!!!!! OMFG!  I love personalized tumor vaccines!!!!! Someday I'll

26  have time to celebrate."

27  38.  On April 28, 2020, Katie received the following text messages from the

28  SUBJECT PHONE NUMBER:

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a. "I'm home, Wading thru all of my new found publicity. Hahahaha!"

b. "I'm in the news! Some panty-wastes in Friday Harbor[1] got upset when I was going to come up and vaccinate their mayor.  It raised a piss load of little tattle tails and they cried to their mom and the AG sent me a cease and desist order on selling the vaccine.  I just simply call it an "immunogen" and it takes care of everything. It just so happens that antibodies to my immunogen can make one immune which then puts it in the vaccine category-but immunogen works for me. : - )"

c. "No – not any of those in my apt. And my lab is in an undisclosed location."

d. "Don't have any flasks or beakers in my house.  I have to be secret.  There aren't many who would understand a garage lab-people tend to frown on that.  I on the other hand have made several labs out of garages and they do exactly what the big nicer labs do. I lived in my lab before I got this awesome apt."

39.     On or about April 27, 2020, the Washington Attorney General's Office (WAGO) issued John T. Stine a "Notice to Cease and Desist" regarding unfair and deceptive acts related to COVID-19 pandemic.  The letter indicated that the WAGO had received information that Stine is selling and administering a COVID-19 "vaccine" and that Stine is making false or unsupported claims about this vaccine that may mislead consumers.  The letter told Stine to "immediately stop making misrepresentations about your COVID-19 'vaccine.'"  Continuing to do so may result in a lawsuit against you and the imposition of civil penalties of up to $2000 per violation."  The WAGO also issues a press release about this letter.

---

[1] On April 21, 2020, the FDA received an emailed complaint regarding Stine.  The complaint stated, in part: "I'm part of a local Facebook group for Friday Harbor, WA and it has been publicly announced there that a friend of the town mayor's is selling a "vaccine" for COVID-19 for $400 / person to 100 lucky people. As such a thing does not exist I believe this should be investigated and the person should be prosecuted. The persons name is Johnny T Stine and his # is 206-605-0100 and website is http://www.northcoastbio.com/NCB/home.html. ..."

Affidavit of Angela Zigler/ - 13

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

40.     On April 29, 2020, Katie texted the SUBJECT PHONE NUMBER about meeting next week to receive the vaccinations, and how many people he can vaccinate at one time.  During the text exchange, Katie received the following text messages from the SUBJECT PHONE NUMBER:

    a.   "So you are aware of the fact that the Attourney General sent me a cease and desist letter."

    b.   "I have to say it like this: What I have is an immunogen which is the nCoV19 spike protein.  Antibodies to the spike protein have been shown to be neutralizing in vitro and in vivo.  Once injected, you will raise a polyclonal antibody response to this immunogen.  Any antibodies generated that happen to neutralize virus will be purely coincidental and an added bonus. Wednesday would work for me."

    c.   "I would like to ask one favor……given that Portland is out of state, let's just make sure that any transactions that take place further be done here in WA-State-so I don't get busted for going over state lines-this is just to be safe please."

    d.   "I mean for payment-It might make a difference and make me compliant if we took care of the financials on this side of the Columbia before me going into Oregon to immunize this group."

    e.   "I have to say immunize-not vaccinate. It's just semantics."

    f.   "Yes. Unless the Attourney General arrests me before then.  They simply said that I can not make claims about a "vaccine". So I just call it an immunogen and that's it."

41.     On May 5, 2020, Katie exchanged texts with the SUBJECT PHONE NUMBER regarding the administration of the COVID-19 vaccination to a group of individuals in Portland on May 6, 2020. At that time, the SUBJECT PHONE NUMBER provided information that the meeting would not take place.

//

Affidavit of Angela Zigler/ - 14

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## H. **Stine's Facebook Contacts**

42.     On May 13, 2020, the Honorable Mary Alice Theiler signed a search warrant for Facebook accounts of Johnny T Stine and North Coast Biologics.  I reviewed the information provided by Facebook and found that the account of Johnny T Stine contained numerous messages and/or discussions regarding his COVID-19 vaccine, specific individuals he did or planned to vaccinate, information regarding the makeup of his COVID-19 vaccine and Stine's laboratory location (SUBJECT PREMISES).  The following are some examples:

    a.    On February 18, 2020, Individual-4 contacted the Subject Facebook Account and stated, "saw another Dr JTS breakthrough FB post….really, you developed a coronavirus vaccine in your Redmond garage lab"

    b.    The Stine Facebook Account replied, "Yes…it took one day to design, two weeks to make, and will be testing my sera for neutralizing antibodies….which at this point is slam dunk based on vaccine design."

    c.    On February 29, 2020, Individual-4 stated, "once you announce all the media will be at your Redmond garage lab and think tank apartment."

    d.    The Stine Facebook Account stated: "I don't want media coverage. The first thing they'll do is try to hang me.  They'll come to the lab with their reporters and cameras and they'll mock my approach by looking at my choice of lab conditions. I'm so glad I kept the location of my lab secret – I knew this could happen at some point in the future if I was out flipping a middle finger to the system and getting things done.  Perhaps it will be something for the book later, but today, I would be persecuted."

    e.    Individual-4, replied "and I haven't told anyone about your garage lab or next door think tank apartment"

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

43.     On April 4, 2020, Individual-4 sent the Stine Facebook Account the below photograph (Photograph 1) that appeared to be a prior Facebook post of Stine in his lab location. Following the posting Individual-4 stated the following:



guys to do the hard work of sc
Presentation.  This process ha
years of evolution/natural sele
are all here today.

35

Like        Co

a.     "looks like you broke into the old ICOS Baja lab"

b.     "do you have any lab help there?"

c.     On April 5, 2020, Individual-4 stated, "guess you can go to your lab anytime" "guess you are too busy in your lab making vaccine to msg"

d.     The Subject Facebook Account replied, "I just woke up from another 12 hour slumber!  No - no lab help.  I would never drag anyone into the cross hairs that I have on me now nor would I ever give up the location

Affidavit of Angela Zigler/ - 16

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      of my lab unless I could find someone I trusted completely.  My sons
2      however, have volunteered to help.  They are immune. And yeah – I can
3      go to my lab whenever – it's like the bat cave."

4   44.   On March 5, 2020, the Stine Facebook Account sent Individual-5 a
5   photograph of his Venmo QR code and Venmo name "@Johnny-Stine" as a payment
6   method for Stine's COVID-19 vaccine.  On March 6, 2020, Individual-5 stated:

7      a.   "I have 7 people and will transfer 2800 to you"

8      b.   "What's last 4 numbers of your phone?"

9      c.   "Having a little problem transferring money with Amex"

10     d.   "Ok it looks like the money transfer was successful"

11  45.   On March 11, 2020, the Stine Facebook Account communicated with
12  Individual-5.  The conversation went as follows:

13     a.   "Good morning Dave! I got the text early this morning that has me
14          routing my trip to Anchorage instead of Houston. I have a mesothelioma
15          patient that has a tumor sample for me and I must pick that up. So I will
16          put in a nice little box 7 loaded syringes and you can administer this
17          round. …."

18     b.   Individual-5 stated, "Sounds good Johnny" and then provided his
19          address in Houston, TX, and cell phone number.

20     c.   The Stine Facebook Account then sent a photograph to Individual-5, of
21          a Priority Overnight FedEx label, containing FedEx tracking number
22          3910 4525 5640. The package was addressed to Individual-5 in
23          Houston, TX.  The shipping label listed the return address as Johnny
24          Stine, 15219 NE 90th St, Redmond, WA 98052 (the SUBJECT
25          PREMISES).

26  46.   On May 13, 2020, the Subject Facebook Account sent the below
27  photograph (Photograph 2) and the following text exchange via Facebook with
28  Individual-5:

Affidavit of Angela Zigler/ - 17

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



a.   The Subject Facebook Account stated: "My serum – loaded with anti-spike protein antibodies!!!"

b.   Individual-5 stated, "so awesome dude you are da man in my book !"

c.   The Subject Facebook Account replied, "Hahaha!!  I can honestly say that I'm a shitty phlebotomist though!!!!"  The Subject Facebook Account then sent the following two photographs, one showing both arms (Photograph 3) and the other showing one arm (Photograph 4).

Affidavit of Angela Zigler/ - 18

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

 

47.     On April 26, 2020, the Stine Facebook Account sent Individual-7 two photographs. The first was of the packaging box for Imiquimod Cream USP, 5%, indicating "Rx Only."  The second photograph included the same Imiquimod 5% Cream, but with a prescription label over the box showing from Costco Wholesale Corporation/Costco Pharmacy. The label indicated that it was prescribed to Johnny Stine. The prescriber listed was Spencer C. Li, and the address 15219 NE 90th St., Redmond, WA (the SUBJECT PREMISES) was listed.  No other addresses, besides the Costco Pharmacy, in Redmond, WA, address were visible on the prescription label photograph. (Further research conducted found that a Dr. Spencer C. Li is a practicing Physician in Texas.  A search of the Washington State Department of Health Provider Credential database did not identify any individuals named Spencer Li).

**I.   FDA/FTC Letter to Stine**

48.     On or about May 21, 2020, the FDA and Federal Trade Commission sent a joint warning letter to Stine that stated based on their review the COVID-19 vaccine that

Affidavit of Angela Zigler/ - 19

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Stine offered for sale in the United States it was found to be an unapproved new drug, a

2  misbranded product and an unlicensed biological product.  The letter stated: "Due to the

3  serious public health concerns related to the marketing and sale of unapproved drugs for

4  the mitigation, prevention, treatment, diagnosis, or cure of COVID-19, it is essential that

5  you do not resume selling your product for prevention of COVID-19."

6      49.     On June 15, 2020, Stine emailed the FDA at the requested address provided

7  in the letter and replied, "I complied immediately with my state AG's office as soon as I

8  received electronically the cease and desist letter.  I didn't know about the letter until

9  receiving the electronic version via email and I replied back to let them know I was in

10  compliance.  My LinkedIn account which was taken down LONG before the AG's letter

11  is still down and as far as I can tell, the FB posts have been removed where I was in

12  communication only with friends and family.  It appears that the LinkedIn data and FB

13  data was removed promptly after receiving the letter from AG which preceded the FDA

14  letter.  I am a "company" of ONE person which makes it hard to receive mail in a timely

15  manner.  But I did receive the electronic version.

16  I only made material in the microgram quantities and had no intention of doing any of

17  this as a business as I was asked to help out due to the dead bodies coming out of the

18  epicenter in Kirkland which is only 5 miles from where I live.

19  Everything has been burned and/or destroyed.  The Moderna spike protein vaccine

20  appears to be on it's way to being administered late in the year or early next.  At the

21  moment, there are 139 vaccines in development and virtually all of them target the spike

22  protein.  I think in time the masses will be well taken care of.

23

24  Johnny Stine

25  Founder & CEO

26  North Coast Biologics

27  500 Yale Ave N

28  Seattle, WA 98109

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   www.northcoastbio.com

2   206-605-0100

3   Sent from NCB iPad"

4       **J.  <u>Additional Surveillance</u>**

5       50.     On May 18, 2020, AT&T subscriber records were received and listed

6   Johnny Stine as the subscriber of the SUBJECT PHONE NUMBER with an address of

7   4025 Stone Way N, Seattle, WA 98103 and billing/credit address of 15219 NE 90th St,

8   Redmond, WA 98052 (SUBJECT PREMISES).

9       51.     On May 29, 2020, the Honorable Mary Alice Theiler signed search warrant

10  and pen trap for this number requesting prospective cell cite location data.

11      52.     On June 1, 2020, agents conducted surveillance of Stine.  At approximately

12  1:32 p.m., SSA Dkane observed Stine using his phone, SSA Dkane exchanged

13  undercover Facebook messages with Stine (using the same undercover identity from the

14  April 6, 2020 messages).  SSA Dkane (acting in an undercover capacity) continued a text

15  conversation with Stine about Stine's plans for the day.  At 1:32 p.m., Stine replied to

16  SSA Dkane's message inquiring about Stine's plans for the day as follows:

17          a.     UC: "What else is on the agenda? A full spa day for ya today? 😊"

18          b.     Stine: "I Wish! I have to do some lab work.  And then have a few

19                 People who need some help today and tomorrow with the nCoV19."

20      53.     Following this exchange, agents maintained surveillance of Stine as he

21  traveled from Issaquah to Sammamish.  SSA Dkane stood on a public walking trail and

22  observed Stine meeting with a Caucasian male while they were standing in the driveway

23  of this residence.  Stine was speaking loudly to this individual and SSA Dkane could hear

24  Stine say the following words during their conversation: "Proteins," "Antibodies" and

25  "I'm just trying to help people." As the conversation came to end, SSA Dkane overheard

26  Stine say, "drugs to lab."  After Stine departed this location, he drove to the easternmost

27  warehouse/garage unit within the Zahntech Automotive Service property at 15215 NE

28  90th St, Redmond, WA, which is the SUBJECT PREMISES located at 15219 NE 90th St,

Redmond, WA.  (Agents first observed Stine drive through a nearby residential community on 92nd Street, where they temporarily lost sight of him before observing him parked at the SUBJECT PREMISES.)

54.     At approximately 2:50 p.m., HSI SA Scott MacDonald observed Stine exit the SUBJECT PREMISES and lock it with his keys.  HSI SA Tammy Spencer relayed to SSA Dkane that this was the same unit she had observed Stine enter following his undercover meeting with SA Zigler and Officer Velling on April 9, 2020.  At that time, SA Spencer also saw Stine access the SUBJECT PREMISES with his keys.

55.     Stine remained at the SUBJECT PREMISES and agents observed Stine walk around the property and speak to some unidentified individuals.  At approximately 3:46 p.m., SA Spencer observed Stine use keys to unlock the door and reenter the SUBJECT PREMISES.  At 3:53 p.m., SA MacDonald observed Stine depart the SUBJECT PREMISES, again using his keys to lock the door.  SA MacDonald observed that Stine was holding a red pouch/folder.  HSI SAs Matt Eidinger and MacDonald then observed Stine access the rear of his vehicle and depart.

56.     Agents then followed Stine as he drove directly to apartments located in Redmond, WA.  Here, at 3:58 p.m., HSI SA Abigail Sawyer observed Stine park and walk into the access-controlled area for residents inside of the parking garage.

57.     On June 2, 2020, agents conducted surveillance of Johnny Stine.  Surveillance units followed Stine to Costco, located at 7725 188th Ave NE, Redmond, WA.  Here, SSA Dkane observed Stine park and enter the Costco.  SA Eidinger also entered the Costco and located Stine within the store.  SA Eidinger followed Stine within the Costco and could hear him talking loudly on his cell phone.  SA Eidinger observed him at the outdoor recreation area talking about picking up an item at the pharmacy.  SA Eidinger then heard Stine say the word "serum."  SA Eidinger observed Stine pick up a prescription at the pharmacy, pay for it, and depart the store.  Agents followed Stine as he then drove to the SUBJECT PREMISES, where Stine remained for less than 10 minutes.

Affidavit of Angela Zigler/ - 22

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  58.  After Stine left the SUBJECT PREMISES, SA Zigler and SSA Dkane

2 walked to the front porch/entry area of the SUBJECT PREMISES.  Agents observed that

3 the front of the unit was a glass "waiting area" separate from the back of the unit by a

4 closed brown door.  Through the uncovered windows, agents observed items in the

5 waiting area. SSA Dkane observed a large standup paddle board marked with the letters,

6 "NSP." SSA Dkane recognized this paddleboard (with the same markings) from a

7 photograph that Stine had sent to SSA Dkane's undercover Facebook identity on May 11,

8 2020.  In this photograph, Stine is shirtless holding the paddle board.  SA Zigler and SSA

9 Dkane then walked to the rear of the unit and observed a transom window over the rear

10 door.  The lights were on and condensation had collected along the window.  Outside of

11 the rear door, agents observed plastic tubs with liquid and gloves.

12  59.  Agents later placed a surveillance camera in an adjacent parking lot and

13 departed.  SSA Dkane later reviewed the footage from this camera, along with data SA

14 Zigler obtained from the court-authorized GPS tracking data.  Based on this information,

15 and paired with the physical observations of Stine, agents determined that he made three

16 more visits to the SUBJECT PREMISES on June 2, 2020.

17  60.  On June 15, 2020, SSA Dkane conducted surveillance of the SUBJECT

18 PREMISES.  SSA Dkane observed Stine at the SUBJECT PREMISES at approximately

19 1:00 p.m. and leaving the SUBJECT PREMISES at approximately 2:14 p.m.  SSA Dkane

20 observed Stine return to the SUBJECT PREMISES at approximately 2:28 p.m. and

21 unlock the SUBJECT PREMISES door, return to his car, open the car's rear lift gate and

22 remove what appeared to be a cylindrical object, which Stine took it into the SUBJECT

23 PREMISES.   SSA Dkane observed Stine leave the SUBJECT PREMISES at

24 approximately 6:10 p.m.  During the time that HSI SSA Dkane observed the SUBJECT

25 PREMISES, HSI SSA Dkane did not see any moving trucks/vehicles, additional people

26 other than Stine and/or any removal of equipment from the SUBJECT PREMISES.

27 Despite Stine's June 15th email to the FDA, agents did not observe evidence that Stine

28 burned or destroyed any records from the premises.

Affidavit of Angela Zigler/ - 23

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

61.     During these surveillances, the court-authorized GPS tracking data from Stine's cell phone was corroborated by the physical surveillance conducted.   Based on this information an HSI Criminal Analyst was able to determine the approximate GPS tracking location data of the SUBJECT PREMISES. The following days show a continued pattern of the cellular phone (and likely Stine) at the SUBJECT PREMISES:

    a. Saturday, 05/30/2020

    b. Monday, 06/01/2020

    c. Tuesday, 06/02/2020

    d. Wednesday, 06/03/2020

    e. Tuesday, 06/09/2020

    f. Wednesday, 06/10/2020

    g. Thursday, 06/11/2020

    h. Friday, 06/12/2020

    i. Monday 06/15/2020

    j. Friday, 6/26/2020

    k. Saturday, 6/27/2020

    l. Sunday, 6/28/2020

    m. Monday, 6/29/2020

    n. Thursday 7/2/2020

    o. Friday, 7/3/2020

    p. Monday, 7/6/2020

    q. Tuesday, 7/7/2020

**K.  WAGO Consent Decree**

62.     On or about June 22, 2020, the WAGO filed a Consent Decree, signed by the WAGO and Stine, that indicated that Stine was to refrain from marketing, advertising, promoting, or selling vaccines, immunogens, antibodies, or any other substance or product that Stine or his company represents to have health benefits unless Stine has sufficient scientific evidence to substantiate each claim or unless the subject or product is

Affidavit of Angela Zigler/ - 24

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  first subjected to safety and efficacy testing.  Stine also agreed to pay State of
2  Washington $38,500; however $30,000 of these funds will be suspended if Stine is in
3  compliance with the Consent Decree.

4      63.     Under the Consent Decree, Stine agreed to provide information on all
5  consumers whom the COVID-19 vaccine was provided or administered, and provided
6  refunds if requested.  Stine was not required by the Consent Decree to produce the names
7  of the tumor vaccine customers.

8      64.     On August 6, 2020, I received a copy of the list Stine provided to the
9  WAGO in response to the Consent Decree. The list contained approximately 51 names
10 (some only first names) and ten corresponding phone numbers. Based on past
11 communications and a review of Stine's Facebook statements this number appears to be
12 much less than previously indicated by Stine.

13     65.     Further, as indicated by the tracking data above, Stine visited the
14 SUBJECT PREMISES multiple times after he entered into the Consent Decree.

15 **L.  Additional Information**

16     66.     On July 16, 2020, the Honorable Brian A. Tsuchida signed a search
17 warrant for Facebook contents related to the accounts of Johnny T Stine and North Coast
18 Biologics regarding tumor vaccines.  I reviewed the information provided by Facebook
19 and found that the account of Johnny T Stine contained numerous messages and/or
20 discussions regarding his tumor vaccines during the time period of 2018 and 2019.  For
21 example, Stine indicated that he had a trip planned to Australia for a glioblastoma patient
22 (posted in 2018), that he was providing a personalized tumor vaccine to a woman in
23 Montana (posted in 2018), that he cured a stage 4 ovarian cancer patient (posted in 2018),
24 and treated an individual with colorectal cancer (posted in 2019).

25 **M. Further August 2020 investigation of SUBJECT PREMISES and Idaho**
26      **UC Meeting**

27     67.     On August 10, 2020, SA Zigler and HSI SSA Dkane went to the
28 SUBJECT PREMISES. Agents observed Stine at the SUBJECT PREMISES. The

Affidavit of Angela Zigler/ - 25

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   SUBJECT VEHICLE, with two surf boards on top of it, was parked in front of the
2   SUBJECT PREMISES.  Stine was observed moving items into an open garage bay,
3   which was the second garage to the right of the SUBJECT PREMISES entry door. SA
4   Zigler and SSA Dkane observed Stine moving what appeared to be an industrial shelving
5   unit into the open bay.  SA Zigler also observed Stine move a surf board into the open
6   bay.  SSA Dkane then drove into the parking area in front of the SUBJECT PREMISES
7   and was able to see into the open bay and that the open bay was connected to the bay
8   directly to its left (this garage/bay door was closed).  SSA Dkane observed a large
9   opening that connected the two bays and what appeared to be several industrial sized
10  refrigerators on the connecting wall between the two bays.  SSA Dkane also believed that
11  one of the refrigerators appeared to be on because it was lit up.

12          68.     On Monday, August 10, 2020, HSI SSA Dkane (in the same undercover
13  capacity as on April 6, 2020) sent a message to STINE via Facebook Messenger.  STINE
14  indicated that he was going to be in Wallace, Idaho, in the next week, and wanted to meet
15  up with the undercover.   During the message exchange the following statements were
16  made (among others, the entire exchange is not included here):

17          a.  Stine: "I'm likely to be in Wallace Tuesday night!  … I was thinking
18              that I'd get a room at the Stardust either tomorrow night or Wed. Night.
19              And then you can come see me."… "Getting shit done … makes me
20              want to take drugs and escape! Crack and meth will make anything
21              better!!!!  Hahaha!   … Meth was fun – made me horny for days!
22              OMG!"

23          b.  UC: "That's why I was asking how long you had to spend in Wallace
24              lol."

25          c.  Stine: "Oh if you get me high ….. I'll stay as long as you keep me high
26              … but hourly rates make it hugely expensive."

27          d.  UC: "I thought we we're not exchanging anything … just a couple of
28              friends helping friends remember?"

Affidavit of Angela Zigler/ - 26

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e.  Stine: "And you would still get me high?"

f.  UC: "I hate to break it to you but meth isn't exactly hard to come by in my profession."

g.  Stine: "Well – get me addicted to it so I'll have to become your regular!!!!"

h.  UC: "I haven't been working because of the whole covid thing. Remember?"

i.  Stine: "Then you can have me – I'm immune!"

j.  UC: "Immune huh? Nice" "Normally I wouldn't care too much, but I think I told you I take care of my brother some times so im paranoid about getting him sick"

k.  Stine: "I will immunize you with the neutralizing epitopes on the spike protein of this virus.  It fucking works! I have a high antibody titer to it and I've been in four quarantine rooms with deathly ill people without a mask and I've never even gotten a sniffle."

l.  UC: "Seriously?"

m.  Stine:  "YES! I even saved a guy's life!!!! That was fucking emotinal for me. Emotional.  …"

n.  Stine: "I think we should Tuesday next week …. that way if you get me really fucked up, I can afford to burn the next 4 or 5 days.  I deserve some looooog meth time."

o.  UC: "Well the fun is in the wait.  Want to touch base tomorrow?  Firm up some plans?"

69.  On August 11, 2020, in further Facebook messenger conversation, Stine confirmed that he would meet the undercover in Wallace, Idaho, on Thursday, August 20, 2020, and that he would provide the undercover the so-called Covid vaccine and Stine would use methamphetamine.  Excerpts from the conversation:

Affidavit of Angela Zigler/ - 27

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.  Stine: "I hear that stuff can be injected?  Maybe you can do that to me too.  I've never tried – I'm still a newbie.  Hahaha!"

b.  UC: "Wait so are we injecting each other then lol?  Cause didn't you say that your stuff is an injection?

c.  Stine: "Yes – it can be – intranasal also."

d.  UC: "You for sure about this?"  [STINE responded "Omg yes!" and then the UC sent a picture of drug paraphernalia.]

e.  UC: "How many injections of your stuff do I need to do?"

f.  Stine: "Well I could give you two to start and then another 3 weeks later."

g.  UC: "If you're serious I'll get everything together.  My friend has an air b n b I could try to get."

h.  Stine: "OK – let's plan on me arriving next Thursday – and we'll do Th night – however long you let me off the drug.  :-).  Yuuuuummmmmy!"

70.     On Wednesday, August 12, 2020, Stine wrote the undercover that he was "on the road to Spokane and then to whitefish so I'm just driving right now."  Later that day, Stine sent a picture of the Oasis Bordello Museum, in Wallace, Idaho, to the UC.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

71.     Based on my training and experience and factual background above, I believe that Stine maintains at least some of the items sought by this affidavit in electronic devices.  For example, I know based on information from my undercover contacts with him that Stine corresponds with individuals through text message.  Also, the "Johnny T Stine" Facebook post, dated March 2, 2020, asked individuals to either "message me here or by text 206-605-0100" regarding the COVID-19 vaccine, indicating he may use computer/laptop and/or phone to log into Facebook.

72.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the SUBJECT PREMISES, in

1  whatever form they are found.  One form in which the records will likely be found is data

2  stored on a computer's hard drive, on other storage media, or other digital devices,

3  including cell phones (hereinafter collectively referred to as digital devices).  Thus, the

4  warrant applied for would authorize the seizure of electronic storage media or the

5  copying of electronically stored information, all under Rule 41(e)(2)(B).

6        73.     There is probable cause to believe that records will be stored on a digital

7  device because, based on my knowledge, training, and experience, I know:

8        a.     Computer files or remnants of such files can be recovered months or even

9  years after they have been downloaded onto a digital device, deleted, or viewed via the

10  Internet.  Electronic files downloaded to a digital device can be stored for years at little or

11  no cost.  Even when files have been deleted, they can be recovered months or years later

12  using forensic tools.  When a person "deletes" a file on a digital device, the data

13  contained in the file does not actually disappear; rather, that data remains on the digital

14  device until it is overwritten by new data.  Therefore, deleted files or remnants of deleted

15  files, may reside in free space or slack space—that is, in space on the digital device that is

16  not currently being used by an active file—for long periods of time before they are

17  overwritten.  In addition, a digital device's operating system may also keep a record of

18  deleted data in a "swap" or "recovery" file.

19        b.     Wholly apart from user-generated files, digital devices—in particular,

20  internal hard drives—contain electronic evidence of how a digital device has been used,

21  what it has been used for, and who has used it.  To give a few examples, this forensic

22  evidence can take the form of operating system configurations, artifacts from operating

23  system or application operation, file system data structures, and virtual memory "swap"

24  or paging files.  Digital device users typically do not erase or delete this evidence,

25  because special software is typically required for that task.  However, it is technically

26  possible to delete this information.

27        c.     Similarly, files that have been viewed via the Internet are sometimes

28  automatically downloaded into a temporary Internet directory or "cache."

Affidavit of Angela Zigler/ - 29

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

74.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant but also for forensic electronic evidence that establishes how digital devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any digital device in the SUBJECT PREMISES, because, based on my knowledge, training, and experience, I know:

a.     Data on the digital device can provide evidence of a file that was once on the digital device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the digital device that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a digital device can also indicate who has used or controlled it.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time.  Further, forensic evidence on a digital device can show how and when it was accessed or used.  Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access to the digital device, its use, and events relating to the

Affidavit of Angela Zigler/ - 30

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

offense under investigation.  This "timeline" information may tend to either inculpate or exculpate the user of the digital device.  Last, forensic evidence on a digital device may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information on a digital device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the digital device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a digital device (e.g., logs indicating that the incriminating information was accessed with a particular program).

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a digital device is evidence may depend on other information stored on the digital device and the application of knowledge about how a digital device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a digital device.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

Affidavit of Angela Zigler/ - 31

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

75.     In most cases, a thorough search for information that might be stored on a digital device often requires the seizure of the device and a later, off-site review consistent with the warrant.  In lieu of removing a digital device from the SUBJECT PREMISES, it is sometimes possible to image or copy it.  Generally speaking, imaging is the taking of a complete electronic picture of the digital device's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the digital device and to prevent the loss of the data either from accidental or intentional destruction.  This is true because:

a.     As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a digital device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine digital devices to obtain evidence.  Digital devices can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Records sought under this warrant could be stored in a variety of formats that may require off-site reviewing with specialized forensic tools.  Similarly, digital devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the digital device off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

76.     *Nature of the examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I apply would permit seizing, imaging, or

otherwise copying digital devices that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the device or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire device, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

77.    If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the digital device do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

78.    If an examination is conducted, and the digital device does not contain any data falling within the ambit of the warrant, the government will return the digital device to its owner within a reasonable period of time following the search and will seal any image of the digital device, absent further authorization from the Court.

79.    The government may retain the digital device as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the digital device and/or the data contained therein.

80.    The government will retain a forensic image of the digital device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

//

Affidavit of Angela Zigler/ - 33

USAO# 2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**Conclusion**

2      82.     Based upon the above, there is probable cause to believe that evidence,

3   fruits and/or instrumentalities of the crimes of introduction, in interstate commerce, of

4   misbranded drugs, in violation of 21 U.S.C. § 331(a), are located at the SUBJECT

5   PREMISES as more fully described in Attachment A to this Affidavit, as well as on and

6   in any digital devices or other electronic storage media found at these locations and  I

7   therefore request that the court issue a warrant authorizing a search of the SUBJECT

8   PREMISES as well as any digital devices and electronic storage media located therein,

9   for the items more fully described in Attachment B hereto, incorporated herein by

10  reference, and the seizure of any such items found therein.

11

12                                        Angela Zigler

13                                        Special Agent, FDA-OCI

14

15      The above-named agent provided a sworn statement to the truth of the foregoing

    affidavit by telephone on **19th** day of August, 2020.

16

17

18                                        HONORABLE MARY ALICE THEILER

19                                        United States Magistrate Judge

20

21

22

23

24

25

26

27

28

**ATTACHMENT A**
**LOCATION TO BE SEARCHED**

The location to be searched is an industrial property located at 15219 NE 90th Street, Redmond, WA 98052, further described as an industrial warehouse with two attached roll-up doors. The property is located in the furthest warehouse/garage unit from the street within the Zahntech Automotive Service complex. There is only one vehicle entry point to this complex, which is off of 152nd Ave NE. The entry waiting area and warehouse/garage unit, further identified by the below photographs.





ATTACHMENT A -- PAGE 1

USAO #2020R00310

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B
## ITEMS TO BE SEIZED

All records, information, and other evidence relating to violation of 21 U.S.C. § 331(a), which involve John T Stine (aka Johnny Stine) and/or North Coast Biologics after January 1, 2018, including:

1.   Supplies, including raw materials, used to manufacture, label, and/or package the "COVID-19 vaccine," "tumor vaccines," cancer treatments, or other treatment products;

2.   Powders, pills, tablets, capsules, creams, syringes, vials, or other containers of any kind, that resemble or appear to be or contain prescription drugs, including but not limited to those containing Imiquimod, Aldara; any drugs with similar properties, that appear to be related to or used with the "COVID-19 vaccine," "tumor vaccines," cancer treatments, or other treatment products;

3.   Labels, inserts, boxes, bottles, bottle caps, external packaging, blister packs, and other packaging materials related to the "COVID-19 vaccine," "tumor vaccines" cancer treatments, or other treatment products;

4.   Records related to the soliciting, ordering, shipment, importation, exportation, purchase, manufacture, sale, distribution, or storage of drugs, including but not limited to U.S. Customs entry forms; FDA and/or Customs detention, refusal and/or seizure notices; Entry Summaries; U.S. Customs Manifests of Goods; U.S. Customs declaration forms; invoices; bills of lading; air way bills; purchase orders; general ledgers; subsidiary ledgers; packing slips; and air bills;

5.   Records, letters and responses to or from the FDA, FTC, U.S. Customs, Washington Attorney Generals Office or any other agencies regarding the COVID vaccine, tumor vaccines, other treatment products or components thereof;

ATTACHMENT B/ - 1

USAO#2020R00310

6.     Indicia of ownership, residency, or occupancy of premises including but not limited to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, canceled envelopes, and bank account records;

7.     Financial accounts records, payments, purchase orders, sale invoices, contracts, agreements, complaints, transactional information, or account ownership information relating to the accounts of John Stine (aka Johnny Stine) or North Coast Biologics;

8.     Currency, checks, money orders, and any electronic forms of payment conducted through applications such as Venmo, Zelle, Bitcoin, Paypal and Cash App;

9.     Any memoranda, records, or correspondence which reference the movement of currency, payment ledgers, payment receipts or memorandums documenting cash, wire, check, direct deposit, or any other form of payment either domestic or international;

10.     Information pertaining to individuals or business that prescribed, ordered, manufactured, compounded, sold, or shipped, any components of the "COVID vaccine," "tumor vaccines," cancer treatments, or other treatment products;

11.     Customers or "patients" lists and their corresponding contact information relating to those individuals that asked about a vaccine, received and/or paid for a vaccine, planned to receive a vaccine, received any type of information or shipment of the "COVID-19 vaccine," a "tumor vaccine" or cancer treatment including active pharmaceutical ingredients, drug components, topical creams, that resemble or appear to be or to contain misbranded drugs;

12.     Travel documents, including flight plans, flight tickets, hotels, receipts;

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

13. Cellular telephones and other communication devices including Blackberry, Android, Galaxy, iPhone, iPad, and similar devices (collectively "SUBJECT DEVICES");

14. All records on the SUBJECT DEVICES that relate to violations of Title 21, U.S.C. § 331 and involve JOHN T. STINE since January 1, 2018, including:

    a. lists of customers, related identifying information and communications and/or text conversations regarding any vaccines or treatments;

    b. all sales of drugs/vaccines, including types, amounts, and prices of drugs/vaccines as well as dates, places, shipments, and amounts of specific transactions and injections;

    c. any information related to sources of drugs/vaccines and drug components (including names, addresses, phone numbers, or any other identifying information);

    d. any information recording JOHN T. STINE's schedule or travel from January 1, 2018, to the present;

    e. all bank records, checks, credit card bills, account information, and other financial records.

    f. Evidence of user attribution showing who used or owned the SUBJECT DEVICE[S] at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

    g. Records evidencing the use of the SUBJECT DEVICE to communicate with Facebook mail servers, including:

        i. records of Internet Protocol addresses used;

        ii. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard

ATTACHMENT B/ - 3

USAO#2020R00310

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    disks or other media that can store data); any handmade form (such as writing); any

2    mechanical form (such as printing or typing); and any photographic form (such as

3    microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or

4    photocopies).

5          The term "storage medium" includes any physical object upon which computer

6    data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory,

7    CD-ROMs, and other magnetic or optical media.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART ST, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970